**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW MEXICO**

LOUETTA BONHAM,

        Plaintiff,

v.                                              No. Civ. 06-065 WJ/WPL

INDEMNITY INSURANCE COMPANY
OF NORTH AMERICA,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

On July 31, 2006, Plaintiff Louetta Bonham ("Plaintiff") filed a Motion for Partial

Summary Judgment (Doc. No. 26) as to Plaintiff's entitlement to stacking under the terms of the

insurance policy issued by Defendant Indemnity Insurance Company of North America

("Defendant"). The same day Defendant filed its Motion and Brief in Support of Summary

Judgment (Doc. No. 29). Plaintiff subsequently filed a Motion to Certify Questions (Doc. No.

37) on December 18, 2006. The Court, having considered the motions, briefs, including

Plaintiff's amended reply, relevant law and being otherwise fully informed, concludes that

Plaintiff's motion to certify and motion for partial summary judgment shall be denied and

Defendant's motion for summary judgment shall be granted.

**I.      FACTUAL BACKGROUND**[1]

---

[1]These background facts are taken from the undisputed material facts set forth in
Plaintiff's Motion for Partial Summary Judgment, Defendant's cross motion for summary
judgment, the parties' briefs responding to each others' undisputed material facts, and the
exhibits attached to the parties' motions and other briefs. Where the facts are disputed, the Court
views them in the light most favorable to the nonmoving party for the purposes of ruling on the
opposing party's motion for summary judgment.

### A.      The Bonhams

Bonham Farms, Inc., ("BFI") is a family farm business that has been incorporated since 1960 and is in good standing.  Pl.'s Mem. Br. in Supp. of Pl.'s Mot. for Partial Summ. J. (Doc. No. 27) ("Pl.'s Br."), Undisputed Fact ("UF") 2; Def.'s Mot. and Br. in Supp. of Summ. J. (Doc. No. 29) ("Def.'s Cross Mot."), UF 11.  William E. ("Bill") Bonham has never done business using BFI as a "d/b/a" for himself individually; rather, BFI has always done business in its own name and right.  Def.'s Cross Mot., UF 11.

William Bonham and his four children, Richard Bonham, Robert ("Bobby") Bonham, Brenda Bonham, and Betty Ann Bonham, are stockholders of BFI.  Pl.'s Br., UF 3-4.  Bobby Bonham has been a shareholder in the company since 1994.  *Id.*, UF 10. Plaintiff married Bobby Bonham in 1989.  *Id.*, UF 5.  At that time, Bobby Bonham worked at BFI, managed the company, and was a foreman.  *Id.*, UF 6. After the marriage, Bobby received additional shares in BFI, which were issued in his name, and he became BFI's general manager.  *Id.*, UF 11, 13.  Since at least June 1, 1999, Bobby Bonham has been a director and officer of BFI.  *Id.*, UF 12.

Shortly after they got married, Plaintiff began working as a part-time bookkeeper for BFI, doing all the payroll, payroll taxes, general ledger, some accounts payable, and preparation of some tax forms.  *Id.*, UF 5; Def.'s Cross Mot., UF 9.  Plaintiff, however, was not a salaried BFI employee.  Def.'s Cross Mot., UF 9.  Nor was she ever a BFI shareholder, officer, or director.  *Id.*

Plaintiff and her husband do not live in the same house as William Bonham.  Pl.'s Br., UF 9.  Plaintiff has never lived in the same house as William Bonham; nor has she ever lived on residence properties that are insured locations of the subject BFI insurance policy.  Def.'s Cross Mot., UF 10.

2

Since 1985, Jerry Andrews has been the insurance agent for BFI and the Bonham family. Pl.'s Br., UF 23; Pl.'s Resp. and Mem. in Supp. thereof to Def.'s Mot. for Summ. J. (Doc. No. 30) ("Pl.'s Resp."), Ex. A ¶ 8 & Ex. C ¶ 14.   Mr. Andrews ran a property and casualty agency until it was bought by Brown & Brown on January 1, 2000.  *See* Pl.'s App. of Ex. in Supp. of Pl.'s Mem. in Supp. of Pl.'s Mot. for Partial Summ. J. (Doc. No. 28) ("Pl.'s App."), Ex. 18 at 6-7.   William Bonham dealt with Mr. Andrews when getting the initial BFI farm/ranch policy, putting applications together, and in handling the subsequent renewals.  *See* Def.'s Cross Mot., UF 12 & Ex. E at 34.   Mr. Andrews' routine was to initially, and annually thereafter at renewal, review all of the policy coverage terms with William Bonham to make sure that what Mr. Andrews was asking for was what William Bonham wanted.  *Id.*, UF 14.   Neither Plaintiff nor her husband ever obtained or renewed the insurance for BFI.  *See id.*, UF 18.   They did, however, discuss insurance issues with Mr. Andrews, such as putting a vehicle on or taking a vehicle off the policy and whether they should put their cars under a separate policy. *Id.*, Ex. E at 34; Pl.'s App., Ex. 15 at 28 & Ex. 16 at 8-9.   Robert Bonham also had input into deciding what amounts of coverage for various types of insurance would go into the farm/ranch policy.  Pl.'s App., Ex. 16 at 9.   Since their marriage, neither Plaintiff nor her husband have had personal auto insurance coverage on any of the vehicles they own, other than through BFI's insurance policy.  Pl.'s Br., UF 14.

**B.     The 1998 Application**

On October 15, 1998, William Bonham, d/b/a BFI, applied for insurance with RBS & Wayne Glass Insurance.  *Id.*, UF 24; Pl.'s App. at 63.   William Bonham and Jerry Andrews prepared the Application.  *See* Pl.'s App. at 62.   The name of the applicant given in the

Application was "William E. Bonham dba Bonham Farms Inc." *Id.* Under the section "Type of Ownership," "Corporation" was marked. *Id.* Under "Driver Information," the Application listed as "drivers who frequently use own vehicles" William, Betty, Robert, and Louetta Bonham as well as Shawna McCarty and Richard Deck. *Id.* at 64. Bobby and Louetta Bonham were also listed in the Application as "Additional insureds" under the heading "Additional Interests." *Id.* at 63. Under "Interest" in the same section, they were described as "Family members; not in household." *Id.* BFI was listed in the "Additional Interests" section with an arrow from BFI pointing to "Named Insured" in the section titled "Affiliated or subsidiary companies to be insured." *Id.* When asked about the meaning of the arrow, Mr. Andrews testified that he understood BFI as who the named insured was to be. *See* Def.'s Cross Mot., Ex. C at 18.

   In the Uninsured ("UM")/Underinsured ("UIM") portion of the "Coverages/Limits" section of the Application, the symbol "7" was marked under "Covered Auto Symbols." Pl.'s App. at 64. Symbol "7" represented "Autos Specified on Schedule." *Id.* The Application lists 12 vehicles, including a 1996 Mercury Grand Marquis (the "Marquis"), for coverage. *Id.* at 64-66. The symbol 7 allowed the insurer to know specifically which vehicles it was insuring. *See id.*, Ex. 18 at 103-04. Under the section entitled "General Information," "No" was marked in answer to the question, "With the exception of encumbrances, are any vehicles not solely owned by and registered to the applicant?" *Id.* at 65. Mr. Andrews testified that he believed this answer was correct, even though the applicant was listed as William Bonham d/b/a BFI and some of the vehicles were owned by the additional insureds, because he understood the question to refer to all the insureds in the Application, which would include vehicles titled to Plaintiff and Robert Bonham. *See id.*, Ex. 18 at 22-25.

4

Additionally, in the UM/UIM portion of the "Coverages/Limits" section,  "CSL" was marked and "$60,000" written.  *Id.* at 64.  "CSL" stood for "combined single limits."  Def.'s Cross Mot., UF 13.  Mr. Andrews discussed with William Bonham his view that a CSL was preferable to "split limits" for UM/UIM coverage, because a CSL allowed more flexibility in maximizing coverage for a particular loss.  *Id.*, UF 15.  He also discussed with William Bonham what became the agreed-on figure of $60,000 CSL for the UM/UIM coverage under the subject policy.  *Id.*  According to Mr. Andrews, William Bonham was satisfied with that figure because he was not interested "in writing lots of limits and things."  *Id.*  William Bonham, however, does not remember the $60,000 figure, as he "kind of left it up to Jerry to keep [him] out of trouble." *Id.*, Ex. E at 22.

Generally, an application for insurance is submitted to the insurance company's underwriting department, which reviews the application, underwrites it, and then if the result is agreeable with the agent and it, the underwriter binds it and processes it according to the data. Pl.'s App., Ex. 20 at 11.  The underwriter basically evaluates the risk and determines the premiums to be charged for the coverage sought.  *Id.*, Ex. 19 at 23.  William Bonham's 1998 Application was the only application underlying the subject policy, because after an application was used to issue an initial policy, the insurer would ordinarily just use the same information with updates from the agent to renew the policy from year to year.  *See id.*, Ex. 20 at 11-12. When underwriting an automobile policy such as the policy in this case, the underwriter bases the premiums paid for the policy, among other things, on the coverage, the list of vehicles, how the vehicles were used, and the listed drivers' driving history.  *See id.*, Ex. 20 at 15-16, 56.  In underwriting the Policy, for purposes of setting the premiums, it did not make a difference who

owned the listed vehicles.  *Id.*, Ex. 20 at 21, 86.  However, one high-risk driver, such as a

youthful driver, would effect the entire policy premium.  *See id.*, Ex. 20 at 22-23.  For example,

Shawna McCarty, Plaintiff's daughter, drove the 1988 Nissan and was rated as a youthful driver,

so the premium on the Nissan was higher.  *Id.*, Ex. 20 at 55.  Although who owned the listed

vehicle did not make a difference in calculating premiums, in order to ensure the underwriter

provided adequate coverage for non-owned vehicles, the underwriter would ask more questions

of the insured as to why coverage for non-owned vehicles was necessary, what the insurable

interests were, whether another named insured should be added, and whether the other person

should have his or her own policy.  *See id.*, Ex. 20 at 86-88.

C.     **The Policy**

Defendant issued a Commercial Automobile Liability Policy, No. D34893755 (the

"Policy"), as part of a Combine Plus farm/ranch package policy to "William H. Bonham DBA

Bonham Farms Inc."  Pl.'s Br., UF 1; Def.'s Cross Mot., UF 1.  The Policy period was effective

for the period from December 15, 2000, to December 15, 2001.  Pl.'s Br., UF 1.  Under the

Policy, following the phrase "Named Insured Is", the boxes for "Corporation" and "Owner

Occupant" are marked.  Pl.'s App. at 6.

Item Two of the Policy lists the schedule of coverages and covered autos.  *Id.* at 9.  Under

the column entitled "Covered Autos," the symbol "7" is listed.  *Id.*  Symbol 7 is described under

the section "Business Auto Coverage Form" as follows:  "Specifically Described 'Autos'-- Only

those 'autos' described in Item Three of the Declarations for which a premium charge is

shown . . . ."  *Id.* at 7.  Item Three of the Policy, entitled "Schedule of Covered Autos You Own,"

lists 13 covered vehicles, one of which is the Marquis.  *See id.* at 11-14; Def.'s Cross Mot., UF 8.

"You" is defined under the Policy as "the Named Insured shown in the Declarations."  Pl.'s App. at 7.  Under the section "Your Name (Named Insured)," the Policy lists "William E. Bonham DBA Bonham Farms Inc."  *Id.* at 6.

Five of the vehicles listed in the Policy are titled in either the name of Robert E. (Bobby) Bonham and/or Robert Bonham or Louetta Bonham.  Pl.'s Br., UF 15.  At all relevant times, Plaintiff and her husband owned the Marquis.  *Id.*, UF 17; Def.'s Cross Mot., UF 7.  Neither BFI nor William Bonham ever owned the Marquis.  Def.'s Cross Mot., UF 7 & Ex. E at 13-14.  Other title owners of the vehicles under the Policy included William Bonham, William Bonham's grandchildren, and BFI.  Pl.'s Br., UF 16.

The Policy contains a standard form UM/UIM endorsement approved by the New Mexico state division of insurance.  Def.'s Cross Mot., UF 2.  The Policy provides limits of $60,000 for UM/UIM coverage for "Each 'Accident.'"  Pl.'s App. at 15; Def.'s Cross Mot., UF 2.  Symbol "7" also designates those autos insured for UM/UIM.  *See* Pl.'s App. at 9.  A separate premium was paid for coverage on each vehicle under the Policy.  Pl.'s Br., UF 21.  The UM/UIM premiums charged for the Marquis were $34.  *Id.*, UF 31.  The other vehicles under the Policy were rated at either $34 or $22 for UM/UIM premiums.  *See id.*; Pl.'s App. at 11, 13.

The Policy's UM/UIM endorsement defines who is considered a "Class 1" versus a "Class 2" ensured:

The following are "insureds" for Uninsured Motorists Coverage:

1. Any Class 1 "insured", meaning you, if you are an individual.  If you are an individual, your "family member" is also a Class 1 "insured".

2. Any Class 2 "insured", meaning:

     a.       You, if you are not an individual;

     b.       Anyone other than a Class 1 "insured" while "occupying" a covered "auto" or a temporary substitute for a covered "auto".  The covered "auto"  must be out of service because of its breakdown, repair, servicing, loss or destruction.  Anyone other than a Class 1 "insured" includes your partners (if you are a partnership), or members (if you are a limited liability company), "employees", directors or shareholders;

     c.       Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured".

Pl.'s App. at 16.  The Policy's UM/UIM endorsement defines the term "family member" as "a person related to you by blood, marriage or adoption who is a resident of your household, including a ward or foster child."  *Id.* at 18.

Section D of the UM/UIM endorsement explains the significance of Class 1 versus Class 2 status as to coverage:

> The Limit of Insurance available to a Class 1 "insured"  may differ from the Limit of Insurance available to a Class 2 "insured".  Read carefully the following paragraphs and the descriptions of Class 1 "insured" and Class 2 "insured" in the Who Is An Insured provision to determine the applicable Limit of Insurance.

> 1.      Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for all damages resulting from any one "accident" is the limit of Uninsured Motorists Coverage shown in the Schedule or Declarations.  If there is more than one covered "auto", and "bodily injury" or "property damage" is sustained by a Class 1 "insured", our Limit of Insurance for any one "accident" is the sum of the limits applicable to each covered "auto". . . .

> 2.      If the "bodily injury" or "property damage" is sustained by any Class 2 "insured" in an "accident" in which no Class 1 "insured" sustained "bodily injury" or "property damage", the Limit of Insurance shown in the Schedule or Declarations for this coverage, at the time of the "accident", is our maximum limit of liability for all damages resulting from any such "accident".

Pl.'s App. 16-17.

William Bonham chose a $1 million limit in liability coverage for the Policy.  Def.'s

Cross Mot., UF 16.  Because this amount was more than the $60,000 CSL limit for UM/UIM,

Defendant's managing general agent who underwrote the Policy wrote to Mr. Andrews,

requesting a signed statement from William Bonham certifying his understanding that UM/UIM

limits could be purchased in an amount up to the amount of the liability coverage limits.  *Id.*  The

insurer required the signed statement to complete the 2000-01 renewal of the Policy.  *Id.*  This

protocol complied with New Mexico's statutory requirement that insureds be offered the

opportunity to buy higher UM/UIM limits than the minimum that must be offered by law, up to

the liability limits of the policy.  *Id.* (citing NMSA 1978, § 66-5-301(A)).  In the signed UM/UIM

confirmation contained in the commercial auto application, William Bonham specifically

initialed the following section:

> I understand and acknowledge that uninsured motorists (UM) bodily injury (BI)
> and property damage (PD) coverages have been explained to me.  I have been
> offered the options of selecting UM limits equal to my liability limits, UM limits
> lower than my liability limits, or to reject UM BI and/or UM PD coverages
> entirely.  I select uninsured motorists limit(s) indicated in this application.
> [$60,000 CSL"]

*Id.*, UF 17 & Ex. G at 4.

### D.    The Accidents

On January 20, 2001, a truck sideswiped Plaintiff while she was driving the Marquis on

Interstate 40 in Amarillo, Texas.  Pl.'s Br., UF 22.  The truck clipped Plaintiff's vehicle, taking

off the side mirror of the Marquis and scraping the side of the car.  Def.'s Resp. Br. in Opp. to

Pl.'s Mot. for Partial Summ. J. (Doc. No. 32) ("Def.'s Resp."), Ex. 1 at 55-56.  Plaintiff was not

injured in that accident.  *Id.*, Ex. 1 at 56.  Plaintiff made a property damage claim for the damage

to the Marquis.  *Id.*, Ex. 1 at 57-58; Pl.'s Br., UF 33.  Defendant adjusted the claim.  Pl.'s Br., UF

34.  Defendant's Claim File Instructions designated Plaintiff as "Payee" for a property damage

claim of $1,328.19.  *Id.*; Pl.'s App. at 58.  While discussing this property damage claim, someone

from Brown & Brown told Plaintiff that she was covered under uninsured motorist, but nothing

else was discussed except the $1,328.19 claim payment.  *See* Def.'s Resp., Ex. 1 at 58-59.  On

January 31, 2001, Plaintiff was issued a claim payment check on behalf of Defendant in the

amount of $1,328.19 payable to the order of "Louetta Bonham."  Pl.'s Br., UF 35.  On February

7, 2001, Defendant received a faxed copy of the police report regarding the incident, which

indicates that Plaintiff was the owner of the Marquis.  *Id.*, UF 32; Pl.'s App., Ex. 19 at 44.

Daniel Frazier, Defendant's Rule 30(b)(6) witness, testified that he believed the January 2001

claim was properly handled and paid.  Pl.'s App., Ex. 19 at 48.  Mr. Frazier also stated that the

fact that Defendant was on notice that Plaintiff owned the Marquis did not have any bearing on

his determination that she was a Class 2 insured.  *See id.*, Ex. 19 at 115.

Subsequently, on March 24, 2001, Plaintiff, while driving the Marquis, was involved in

another wreck.  Pl.'s Br., UF 18.  Ryan J. Bromley caused this second wreck.  *Id.*  Mr. Bromley

was insured with Allstate Insurance, who had policy limits of $100,000, some of which were

paid to John Draper, an additional party involved in the wreck.  *Id.*, UF 19.  Approximately three

years after the accident, Plaintiff and her counsel worked toward a settlement with Allstate.

Def.'s Cross Mot., UF 24.  Plaintiff settled her tort claim against Mr. Bromley with Allstate for

the remaining $85,008.73, more than the $60,000 CSL of UIM coverage under the Policy.  *Id.*,

UF 25; Pl.'s Br., UF 19.  On February 11, 2004, Plaintiff, who claimed that her damages from the

accident exceeded the $100,000.00 liability limits, first submitted a UIM claim to Defendant under the Policy.  *See* Def.'s Cross Mot., UF 24 & Ex. K.

### E.      Coverage Expectations

Plaintiff argues that she is entitled to stack UM/UIM coverage as a Class 1 insured under the Policy.  *Id.*, UF 26.  In her deposition, Plaintiff stated that from conversations she and her husband had with Jerry Andrews she understood that she and her husband were "totally covered." Pl.'s App., Ex. 15 at 27.  In 1996, either Plaintiff or her husband asked Mr. Andrews whether it would be better to put their cars under an insurance policy for another ranch of theirs, but Mr. Andrews said no because they "were fully covered" and they "were fine."  *Id.*, Ex. 15 at 28. Defendant contests the relevancy of Plaintiff's understanding on the stacking issue and argues that she could still be considered "totally covered" as a Class 2 insured.  Def.'s Resp. at 5-6.

Although Robert Bonham had fairly frequent discussions with Mr. Andrews about coverage under the Policy, Robert Bonham does not remember the specifics of most of the discussions.  *See* Def.'s Cross Mot., Ex. I at 10-11.  He does not remember discussing what "CSL" meant or the $60,000 CSL figure for UM/UIM coverage and whether that amount was sufficient.  *Id.*, Ex. I at 11-12.  He also does not remember any discussions about Class 1 versus Class 2 insureds for UM/UIM coverage before Plaintiff's 2001 wreck.  *Id.*, Ex. I at 12.  He does remember, however, asking Mr. Andrews frequently whether he had adequate coverage for the business in automobiles or the farm as a whole.  *Id.*, Ex. I at 13.  Both Robert Bonham and Plaintiff intended to have the same coverage as William Bonham.  Pl.'s Resp., Ex. B ¶ 18 & Ex. C ¶ 16.

Jerry Andrews declared in his deposition that he thought Plaintiff would be considered a

Class 1 insured and intended for her to be able to stack the UM/UIM policies.  Pl.'s App., Ex. 18 at 58-59, 112.  Mr. Andrews' belief was based on Robert Bonham's daily work on the farm and Plaintiff's bookkeeping work for BFI.  *See id.*, Ex. 18 at 58-59.  Mr. Andrews admitted, however, that he does not remember telling Plaintiff and Robert Bonham that they were one hundred percent insured all the way around.  Def.'s Reply in Supp. of its Mot. for Summ. J. (Doc. No. 34), Ex. 2 at 111.  As he explained, "fully covered is kind of a wide-open term that can mean a lot of things."  *Id.*, Ex. 2 at 112.  It was not until after Plaintiff's accident that Mr. Andrews specifically told Robert Bonham that Plaintiff should be able to stack UM/UIM coverage.  Pl.'s Resp., Ex. B ¶¶ 13, 17.  In addition, Mr. Andrews testified that he discussed with William Bonham generally what the concept of stacking was, but that he did not remember discussing with him the difference between Class 1 and Class 2 insured status or the limitations on stacking for family members or shareholders.  *See* Def.'s Resp., Ex. 2 at 73-76; Def.'s Cross Mot., Ex. C at 57.

William Bonham has virtually no memory of any such discussions.  Def.'s Cross Mot., UF 22.  William Bonham does not recall any discussions with Mr. Andrews about "Class 1" versus "Class 2" status for UM/UIM coverage purposes, does not know what those distinctions mean, and has never heard of the term "stacking."  *Id.*, UF 20.  He also does not remember why he chose the $60,000 CSL, how that figure would work if there were an accident, or any conversations about how much UM/UIM coverage he ought to have.  *Id.*, UF 22.  William Bonham, however, did intend and expect that Plaintiff and Bobby Bonham would be "totally covered" and have the same coverage and protection under the Policy that he had.  Pl.'s Resp., Ex. A, ¶¶ 10, 12-13.  He also stated that Mr. Andrews told him on numerous occasions that his

family members were "totally covered."  *Id.*, Ex. A., ¶ 11.

In December 2004, Mr. Andrews wrote a letter indicating that he considered Plaintiff and her husband to be Class 1 insureds.  *See* Pl.'s App. at 68.  Mr. Andrews' letter was in response to a request from Plaintiff's attorney for such a letter.  Def.'s Cross Mot., Ex. C at 55-57; Def.'s Resp., Ex. 3.  Defendant asserts that Jerry Andrews' purported understanding of what the Policy meant is not relevant, does not create disputed issues of fact, and is dubious at best.  Def.'s Resp. at 6.  Although Mr. Andrews does not currently work with the Bonhams due to a two-year non-compete clause with Brown & Brown following his quitting the agency, he would like to work with the Bonhams again following the expiration of the two-year term.  *See* Def.'s Resp., Ex. 2 at 9-10.  Defendant contends that Mr. Andrews' testimony should be viewed in light of his financial interest in working with the Bonhams again.

F.    **Procedural History**

On September 19, 2005, Plaintiff sued Defendant in state court for (1) bad faith, (2) breach of contract, (3) violation of the New Mexico Insurance Code, (4) violation of the New Mexico Unfair Trade Practices Act, (5) prima facie tort, and (6) negligence.  After removal, the parties filed cross motions for summary judgment.  Plaintiff seeks summary judgment on her entitlement to stacking.  Defendant argues that Plaintiff is not entitled to stacking as a matter of law, and thus asks the Court to grant it summary judgment on all Plaintiff's claims.  Following briefing on the motions, Plaintiff filed a Motion to Certify Questions, seeking to certify the following three questions to the New Mexico Supreme Court:  (1) Under the facts of this case, is Plaintiff as a matter of law entitled to stacking of the UM/UIM coverage? (2) Under the facts of this case, did Plaintiff as a matter of law have a reasonable expectation that she was entitled to

13

stack coverage under the policy? (3) Under the facts of this case, as a matter of law is the anti-stacking provision repugnant to New Mexico public policy?  Defendant asserts that certification is unnecessary and asks the Court to rule on the cross motions for summary judgment.

## II.      STANDARD

Summary judgment is appropriate only if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).   "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party."  *Id.* (internal quotations omitted). Under Rule 56(c), the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment.  *Id.* at 248.

The parties' filing of cross-motions for summary judgment does not change this standard of review.  *Burrows v. Cherokee County Sheriff's Officers*, 2005 WL 1185620 (D. Kan. May 18, 2005) (unpublished opinion) (citing *Taft Broadcasting Co. v. U.S.*, 929 F.2d 240, 249 (6th Cir. 1991)).  Where the parties file cross motions for summary judgment, the court is "entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."  *James Barlow Family Ltd. Partnership v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997). "Cross-motions for summary judgment are to be treated separately; the denial of one does not

14

require the grant of another." *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

## III.   DISCUSSION

In this diversity action, New Mexico substantive law governs.  *See Martin v. Unit Rig and Equipment Co., Inc.*, 715 F.2d 1434, 1438 (10th Cir. 1983).  If the state's highest court has not addressed the issue, the federal court must determine what decision the state court would make if faced with the same facts and issues by considering state court decisions, decisions of other states, federal decisions, and the general weight and trend of authority.  *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir. 1988).  Before deciding the merits of the cross motions for summary judgment, the Court must first determine whether it should certify the issues to the Supreme Court of New Mexico.

### A.   Motion to Certify

The New Mexico Supreme Court "may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision or statute of this state."  NMSA 1978, § 39-7-4.  The decision to certify a question of state law to the state supreme court is within the sound discretion of the federal district court.  *Allstate Ins. Co. v. Brown*, 920 F.2d 664, 667 (10th Cir. 1990) (citing *Lehman Brothers v. Schein*, 416 U.S. 386, 391 (1974)).  "Certification is not to be routinely invoked whenever a federal court is presented with an unsettled question of state law."  *Armijo*, 843 F.2d at 407.  Under the diversity statutes, federal courts have a duty to decide questions of state law, even if the issues are difficult or uncertain.  *See Copier v. Smith & Wesson Corp.*, 138 F.3d 833, 838 (10th Cir. 1998).  In

determining whether certification is appropriate, federal courts should consider whether the legal

issue is novel and the applicable state law unsettled. *Brown*, 920 F.2d at 667.  A mere difficulty

in determining local law, while necessary, does not compel certification.  *See Copier*, 138 F.3d at

839.  In discussing criteria for pretrial certification from a federal court, the New Mexico

Supreme Court explained:

> [T]he degree of uncertainty in the law and prospects for judicial economy in the
> termination of litigation are considered in deciding whether to accept pretrial
> certification from federal court. These considerations, however, are appropriately
> weighed against the advantages of normal appellate review in determining
> whether to accept certification.  To these criteria . . ., we would add that in all
> certifications the issue should present a significant question of law under the New
> Mexico Constitution or be one of such substantial public interest that it should be
> determined by this Court.

*Schlieter v. Carlos*, 108 N.M. 507, 511, 775 P.2d 709, 713 (1989).

The Court finds that certification of Plaintiff's claims concerning stacking as to the

particular facts of Plaintiff's case would be inappropriate.  Plaintiff points to no issues raised in

this case that implicate either unsettled or novel aspects of New Mexico law.  The considerable

number of New Mexico cases cited as authority in the cross motions for summary judgment

attests to the significant body of law on the issue of stacking.  That the cited authorities may be

distinguishable because the facts of this case do not exactly mirror those in any one case does not

compel certification.  *See Copier*, 138 F.3d at 839 (rejecting rule that would require district court

to certify issue if it could not rule out even slightest degree of uncertainty in state law).  As the

United States Supreme Court has stated, "Novel, unsettled questions of state law, however, not

'unique circumstances,' are necessary before federal courts may avail themselves of state

certification procedures." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997).

The requested questions to be certified pertain to the "facts of this case" and are not the sort of general questions of state law in which the public has a substantial interest to which the certification statute is designed to address.  The principles of law set forth in the numerous New Mexico cases cited to this Court are sufficient for this Court to meaningfully apply the facts of this case to determine the appropriate outcome.  The Court will not burden the New Mexico Supreme Court with a question that is not clearly novel and untested by the New Mexico courts.  The Court therefore denies Plaintiff's motion to certify.

**B.      Defendant's Motion for Summary Judgment**

New Mexico statutorily mandates that insurance companies must include underinsured motorist coverage with uninsured motorist coverage in all automobile liability policies sold in the state.  NMSA 1978, § 66-5-301(B); *Morro v. Farmers Ins. Group*, 106 N.M. 669, 670, 748 P.2d 512, 513 (1988).  Underinsured status occurs when the aggregate of the insured's UM coverage is greater than the tortfeasor's liability coverage.  *See Morro*, 106 N.M. at 672, 748 P.2d at 515 (citing *Schmick v. State Farm Mut. Auto Ins. Co.*, 103 N.M. 216, 223, 704 P.2d 1092, 1099 (1985)).  An insured is entitled to collect "from his underinsured motorist carrier the difference between his uninsured motorist coverage and the tortfeasor's liability coverage or the difference between his damages and the tortfeasor's liability coverage, whichever is less."  *Id.* (quoting *Schmick*, 103 N.M. at 222, 704 P.2d at 1098).  The intent of the legislature in enacting this statute was to put an injured insured in the same position he would have been in had the tortfeasor had liability coverage in an amount equal to the UM/UIM protection purchased for the insured's benefit.  *Id.* at 670, 748 P.2d at 513.  To determine a tortfeasor's underinsured status, an injured insured may stack all policy coverage under which the injured insured is a beneficiary.  *See State*

17

*Farm Mut. Auto Ins. Co. v. Jones*, 2006-NMCA-060, ¶ 10, 135 P.3d 1277.

The central issue in this case is whether Plaintiff is entitled to stacking. Here, the term "stacking" refers to the right of an insured to aggregate the coverage under one policy covering more than one automobile until all the damages of the insured are satisfied or until the limits of the applicable policies are exhausted. *See Ponder v. State Farm Mutual Automobile Ins. Co.*, 2000-NMSC-033, ¶ 10, 12 P.3d 960. Policy stacking is stacked UM coverage that is granted by the express terms of the policy. *Jaramillo v. Providence Washington Ins. Co.*, 117 N.M. 337, 339 n.1, 871 P.2d 1343, 1345 (1994). Judicial stacking, on the other hand, "is a rule of construction applied by the courts based on public policy." *Id.* Plaintiff contends that she is entitled to judicial stacking. Defendant, however, argues that it should be granted summary judgment on all Plaintiffs' claims because Plaintiff is not entitled to stacked UM coverage under the clear terms of the Policy and based on the extrinsic evidence. Defendant also asserts that Plaintiff is not entitled to stacking under either the reasonable expectations doctrine or public policy. To resolve the question of whether Plaintiff is entitled to stacking, the Court must first look to the express language of the Policy to determine whether or not it is ambiguous. *See Ponder*, 2000-NMSC-033, ¶¶ 11-12, 12 P.3d 960.

> **1.     Whether Plaintiff is entitled to Stacking under the Express Terms of the Policy**

Insurance contracts are to be construed in the same manner as other contracts. *Rummel v. Lexington Ins. Co.*, 1997-NMSC-041, ¶ 18, 945 P.2d 970. A court must look to the language of the policy to try to ascertain the purpose, meaning, and intent of the contracting parties. *See Ponder*, 2000-NMSC-033, ¶ 11, 12 P.3d 960. Ambiguities can arise in interpreting a contract in

a variety of circumstances, including when separate sections of a policy appear to conflict with one another, when the language of a provision is susceptible to more than one meaning, when the structure of the policy is illogical, or when a particular matter of coverage is not explicitly addressed by the policy. *Id.* To determine whether a provision is reasonably subject to competing interpretations, the court should ask what a reasonably intelligent, non-lawyer lay person might understand the policy to mean, in light of the usual and natural meaning of words and the circumstances prior to and in making the policy. *Rummel*, 1997-NMSC-041, ¶ 19, 945 P.2d 970. Determining whether a policy is reasonably susceptible to different interpretations is a question of law. *See id.*

Under the Policy, only Class 1 insureds are entitled to stacking. The Policy expressly states, "If there is more than one covered 'auto' and 'bodily injury' or 'property damage' is sustained by a Class 1 'insured', our Limit of Insurance for any one 'accident' is the sum of the limits applicable to each covered 'auto'." Pl.'s App. at 16. As to Class 2 insureds, the Policy provides that "the Limit of Insurance shown in the Schedule or Declarations for this coverage, at the time of the 'accident', is our maximum limit of liability for all damages resulting from any such 'accident'." *Id.* at 17. The Court must therefore determine whether Plaintiff is a Class 1 insured under the express terms of the Policy.

The UM/UIM endorsement defines a Class 1 insured as "you, if you are an individual. If you are an individual your 'family member' is also a Class 1 'insured'." Pl.'s App. at 16. The endorsement then defines a Class 2 insured as "You, if you are not an individual;" "Anyone other than a Class 1 'insured' while 'occupying' a covered 'auto'"; and "Anyone for damages he or she is entitled to recover because of 'bodily injury' sustained by another 'insured'". *Id.* The

19

UM/UIM endorsement does not define the term "individual."  "You", however, is defined in the Policy as "the Named Insured shown in the Declarations."  *Id.* at 7.  The Declarations shows the "Named Insured" as "William E. Bonham DBA Bonham Farms Inc."  *Id.* at 6.  The "Named Insured" is marked on the Policy as "Corporation" and "Owner Occupant."  *Id.*  The term "Individual" is not marked.  *Id.*

Whether there is a Class 1 insured under the Policy thus depends on whether or not the named insured is an "individual."  If only BFI is the named insured, then there would be no Class 1 insureds because only an individual and "family members" of the individual can be Class 1 insureds.  BFI is a "corporation", not an "individual", within the terms of the Policy, and thus, BFI is a Class 2 insured under the Policy.  *Cf. Rehders v. Allstate Ins. Co.*, 2006-NMCA-058, ¶ 18, 135 P.3d 237 (plaintiff not Class 1 insured because "named insured" was corporation), *cert. granted by* 2006-NMCERT-5, 136 P.3d 569.  Moreover, the Policy specifically defines employees, directors, or shareholders as Class 2 insureds.  *See* Pl.'s App. at 16 ("Anyone other than a Class 1 'insured' includes . . . 'employees', directors or shareholders. . . .").[2]  On the other hand, if William Bonham is also a "Named Insured" under the Policy and if he is an "individual,"

_____

[2]Plaintiff relies on the case of *Horne v. United States Fidelity & Guaranty Co.*, 109 N.M. 786, 791 P.2d 61 (1990), *overruled on other grounds by Jaramillo*, 117 N.M. 337, 871 P.2d 1343, to support her argument that she, as an employee, is a Class 1 insured.  The Court finds the *Horne* case distinguishable.  In *Horne*, the Court found the policy language defining Class 1 insureds as "You or any family member" ambiguous because the policy did not indicate the meaning of the phrase in the context of a business policy where the corporation was the named insured.  *See id.* at 787-88, 791 P.2d at 62-63.  In contrast, the Policy here restricts Class 1 insureds where "you" is an individual to the individual named insured and his/her family members.  The Policy further defines "You, if you are not an individual" as a Class 2 insured and specifically states that employees, directors, or shareholders are Class 2 insureds.  Consequently, unlike in *Horne*, the Policy in this case makes clear that the phrase "family member" does not encompass employees.  *Horne* thus is inapplicable to this case.

then he and his "family members" would be Class 1 insureds. *Cf. Rehders*, 2006-NMCA-058, ¶ 18, 135 P.3d at 243 (insured is Class 1 insured only when an individual is designated in declarations as "named insured").

Based on the express language of the Policy, the Court finds that it is unclear as to whether or not the "Named Insured" was BFI or BFI and William Bonham. The phrase "William E. Bonham DBA Bonham Farms Inc." could reasonably be construed as referring to both BFI and William Bonham, because both William Bonham, the person, and BFI, the corporation, are named. "DBA" serves to further confuse, rather than clarify, the intended insured. Although "Individual" was not marked in the Declarations, "Owner Occupant" was marked in addition to "Corporation", indicating that the "Named Insured" was not a single entity. The Court therefore finds that a reasonable interpretation of the Policy listing the named insured as "William E. Bonham DBA Bonham Farms Inc." is that both BFI and William Bonham are named insureds under the Policy. *Cf. Benns v. Continental Cas. Co.*, 982 F.2d 461, 462-63 (10th Cir. 1993) (where named insureds under policy were only corporate entities -- "Benns Communication Corporation" and "WHYW Associates, Limited" -- named insureds were not individuals); *Rehders*, 2006-NMCA-058, ¶¶ 7, 16, 135 P.3d 237 (corporation was insured where parents specifically changed "named insured" from "John G. Rehders, General Contractor" to "John G. Rehders General Contractor, Inc." and changed "form of named insured's business" from "individual" to "corporation").

The Court also concludes that, even though "Individual" was not marked under "Named Insured Is", William Bonham is an "individual" within the meaning of the "Who Is An Insured" section of the UM/UIM endorsement. Although "individual" is not defined in the policy, a

21

natural reading of the term "individual" would encompass a natural person listed in the Declarations.  Black's Law Dictionary defines "Individual" as "a single person as distinguished from a group or class, and also, very commonly, a private or natural person as distinguished from a partnership, corporation, or association."  Black's Law Dictionary 773 (6th ed. 1990).  A reasonable interpretation of the Policy is thus that William Bonham, a named, natural person, in contrast to a corporation, is an "individual" within the meaning of the UM/UIM endorsement.

Nevertheless, even under this broader interpretation of the "Named Insured", Plaintiff still does not qualify as a "Class 1" insured.  Plaintiff is not the natural person listed as the "Named Insured" – only William Bonham is.  Plaintiff thus could only be a Class 1 insured if she fell within the Policy's definition of "family member."  The UM/UIM endorsement defines the term "family member" as "a person related to you by blood, marriage or adoption who is a resident of your household, including a ward or foster child."  Pl.'s App. at 18.  It is undisputed, however, that Plaintiff has never been a resident of William Bonham's household, and therefore, she cannot be deemed a "family member" under the Policy.  *See Ponder*, 2000-NMSC-033, ¶ 12, 12 P.3d 960 (under unambiguous, express terms of policy defining "relative" as "a person related to you or your spouse by blood, marriage or adoption who lives with you", plaintiff was not Class 1 insured because she did not live with her parents).  Accordingly, regardless of whether the named insured is BFI or William Bonham and BFI,  Plaintiff does not constitute a Class 1 insured under the terms of the Policy.

### 2.      Whether Policy is Ambiguous based on Extrinsic Evidence

The conclusion that Plaintiff was not a Class 1 insured under the express provisions of the Policy does not end the inquiry.  *See Ponder*, 2000-NMSC-033, ¶ 13, 12 P.3d 960.  New Mexico

law no longer restricts contract interpretation to language found within the four corners of an insurance policy. *Id.* "[C]ourts are now allowed to consider extrinsic evidence in determining whether an ambiguity exists in the first instance, or to resolve any ambiguities that a court may discover." *Id.* One party's unilateral, subjective impressions or private intentions, however, without more, are insufficient to create an ambiguity in light of clear contract language. *Id.* ¶ 14, 12 P.3d 960.

Plaintiff's primary argument is that all the surrounding circumstances create an ambiguity in the Policy. Specifically, Plaintiff asks the Court to find an ambiguity based on the following facts: the separate UM/UIM premiums that the Policy charged for each insured vehicle; Plaintiff and her husband's work for BFI; Plaintiff and her husband's owning the Marquis and four other vehicles insured by the Policy; the 1998 Application listing Plaintiff and her husband as "additional insureds"; Jerry Andrews' statements that Plaintiff was "totally covered" under the Policy and did not need to insure their vehicles under a separate policy; Jerry Andrews' post-accident statements that he believed Plaintiff was a Class 1 insured; and Plaintiff being issued a check for the January 20, 2001 accident.

Based on the Court's review of the circumstances surrounding the agreement, the conduct of the parties, and the oral expressions of the parties' intentions, the Court concludes that the Policy was not ambiguous. First, the fact that William Bonham paid separate premiums under the Policy indicates that stacking of the UIM coverages is available for those vehicles for the Class 1 insureds. That fact, however, does not shed light on whether Plaintiff is a Class 1 insured. Additionally, although there is evidence that a higher premium was assessed under the Policy for Plaintiff's youthful daughter, the record does not show that a higher premium was

23

attributable to Plaintiff herself.  Second, Plaintiff's work for BFI also does not create an

ambiguity, because the Policy clearly defines employees, directors, and shareholders as Class 2

insureds.  There are no statements made by Defendant to the contrary in the record.  Nor was

there any evidence that the parties intended for employees to be Class 1 insureds.  *Cf. Herrera v.*

*Mountain States Mut. Cas. Co.*, 115 N.M. 57, 58-59, 846 P.2d 1066, 1067-68 (1993) (no

ambiguity because named insured stated in policy was corporation and named insured does not

include employees).  Third, Plaintiff's ownership of the Marquis and four other vehicles insured

by the Policy does not reveal any ambiguities in the Policy.  Ownership of the insured vehicles

was irrelevant to setting the policy premiums, and there is nothing in the Policy nor any

statements in the record that suggest that the parties intended vehicle owners to be Class 1

insureds.  Fourth, the fact that Plaintiff was listed as an "additional insured" in the 1998

Application is not sufficient to create an ambiguity.  Had the Policy defined "you"  merely as the

"named insured", the Court might be inclined to agree that "you" was ambiguous.  The problem

with Plaintiff's argument, however, is that the Policy defines "you" as "the Named Insured

*shown in the Declarations*."  Pl.'s App. at 7 (emphasis added).  The Declarations portion of the

Policy lists the "Named Insured" as only "William E. Bonham DBA Bonham Farms Inc."

Moreover, when asked about BFI being listed in the Application under "additional interests" with

an arrow pointing to "Named Insured," Mr. Andrews testified that he understood BFI as who the

named insured was to be.  The evidence thus does not indicate that the parties intended Plaintiff

to also be the "Named Insured."

 Mr. Andrews' statements to Plaintiff similarly do not support a finding that the Policy is

ambiguous.  Although Mr. Andrews stated in 1996 that Plaintiff and her husband did not need

another car insurance policy because they were "fully covered" and "were fine", Plaintiff never specifically inquired as to whether their coverage included UM/UIM stacking.  As Mr. Andrews himself conceded, the phrase "fully covered" is a wide open term that can mean a variety of things.  A Class 2 insured, while not entitled to stacking, could still consider herself "fully covered," since she would still have UM/UIM coverage.  The record shows that neither Plaintiff, nor her husband, nor William Bonham ever inquired about whether Plaintiff was a Class 1 insured or if she were entitled to stacking.  Without any context of discussions about stacking or being a Class 1 insured, the statement that Plaintiff was "fully covered" is divorced of meaning and does not create an ambiguity.  As to William Bonham's, Plaintiff's, and Robert Bonham's stated expectations that Plaintiff would have the same coverage as William Bonham had, there is no evidence that they ever expressed these intentions to Defendant.  A party's undisclosed intentions do not create an ambiguity.  *Ponder*, 2000-NMSC-033, ¶ 14, 12 P.3d 960. Furthermore, Mr. Andrews' post-accident statements that he believed Plaintiff was a Class 1 insured cannot create an ambiguity because the statements do not shed light on the parties' intentions at the time they entered the agreement.  *See Rummel*, 1997-NMSC-041, ¶ 19, 945 P.2d 970 (in determining existence of ambiguity, court should look at circumstances prior to and contemporaneous with making of policy).

Plaintiff relies heavily on *Ponder* in support of her argument.  In *Ponder*, the plaintiff's mother specifically told the agency for State Farm that her daughter had married and was moving in and out of the parents' home and that she wanted to ensure that her daughter would maintain coverage on all the other vehicles in the policy.  *Id.* ¶¶ 15-17, 12 P.3d 960.  The plaintiff's mother had multiple conversations with the agency to confirm that her daughter would *continue*

25

to have "full coverage."  *Id.*  The agency repeatedly confirmed that the plaintiff would *continue* to have full coverage.  *Id.*

This Court has carefully considered *Ponder* and finds that the representations of *continuation* of full coverage distinguishes *Ponder* from this case.  There, the plaintiff originally was entitled to stack coverage.  Although the plaintiff's mother never discussed stacking in particular, she repeatedly wanted to ensure that her daughter's full coverage continued, and the insurer represented that full coverage would continue without the need to make any changes. The plaintiff thus had a reasonable expectation that her "full coverage" meant whatever coverage she originally had.  In contrast, here there was no context for the term "totally covered" as neither Plaintiff, her husband, nor William Bonham ever discussed stacking or Class 1 insured status with Mr. Andrews or Defendant.  Nor was a representation ever made to Plaintiff, her husband, or William Bonham that Plaintiff enjoyed the same coverage as William Bonham.  Nor did Plaintiff ever live in William Bonham's household.  As the *Ponder* Court explained, "We note that our disposition of this case might have been different if [the plaintiff] had not been previously insured as a Class 1 insured for there may have been less credence to the argument that the Ponders had a reasonable expectation that their daughter was covered as a Class 1 insured."  *Id.* ¶ 29 n.2, 12 P.3d 960.  Such is the case here.  Mr. Andrews' general statements that Plaintiff was "totally covered" do not create an ambiguity in the Policy because the term lacks context as to the stacking issue.  To find an ambiguity under the circumstances of this case would be to extend *Ponder*'s holding further than the New Mexico Supreme Court indicated it should go.

Finally, the Court finds the fact that Plaintiff was issued a check arising from the January

26

20, 2001 accident irrelevant to this issue.  Plaintiff received the check for property damage for

$1,328.19, well below the Policy's $60,000 CSL.  Defendant did not indicate to Plaintiff at that

time that she was entitled to stack UM/UIM coverages, as the issue never arose.  The fact that the

check was made payable to Plaintiff is also not evidence that she was considered a Class 1

insured under the Policy.  A Class 2 insured entitled to a claim payment could anticipate

receiving a similar check.  The January 20, 2001 incident thus does not support a finding that the

Policy was ambiguous.

In sum, the Court concludes that the extrinsic evidence in this case does not create

ambiguity in the Policy.

### 3.        Reasonable Expectations

The doctrine of reasonable expectations applies when the language of the insurance

policy, representations of the insurance company, or the dynamics of the insurance transaction

lead an insured to reasonably expect coverage.  *See Barth v. Coleman*, 118 N.M. 1, 5, 878 P.2d

319, 323 (1994); *Berlangieri v. Running Elk Corp.*, 2002-NMCA-046, ¶ 13, 44 P.3d 538.  The

court's construction of an insurance policy is guided by the reasonable expectations of the

insured where the policy is found to be unclear and ambiguous.  *Ponder*, 2000-NMSC-033, ¶ 26,

12 P.3d 960.  Thus, "the insured's expectations only come into play to resolve ambiguities once

*the court* determines, based on the contract language together with any extrinsic evidence offered

by the parties, that the contract is ambiguous."  *Mesa Oil, Inc. v. Ins. Co. of North America*, 123

F.3d 1333, 1340 (10th Cir. 1997) (citing *Jaramillo*, 117 N.M. 337, 871 P.2d at 1346-47).

Judgment as a matter of law against an insured is appropriate when the insured's expectations do

not reasonably extend to the facts of the case or when the insured's expectations conflict with the

clear language of the policy itself.  *Berlangieri*, 2002-NMCA-046, ¶ 13, 44 P.3d 538.

The Court has concluded, based on both the policy language and the extrinsic evidence, that the Policy is not ambiguous.  Plaintiff's expectation of stacking is unreasonable because it conflicts with the clear terms of the Policy.  Moreover, the oral representations identified in this case would not lead a reasonable person to expect stacking because the phrase "fully covered" has multiple meanings and neither Defendant nor Mr. Andrews nor any other agent had even discussed the meaning of Class 1 insured status to Plaintiff, her husband, or William Bonham or told Plaintiff that she enjoyed the same coverage as William Bonham.  Accordingly, Plaintiff did not have a reasonable expectation that she was a Class 1 insured entitled to stacking.  *See Mesa Oil*, 123 F.3d at 1340 (holding that any expectation that plaintiff was insured for ongoing oil spillage would have been unreasonable where plain language of pollution exclusion precluded coverage and extrinsic evidence did not create ambiguity); *Berlangieri*, 2002-NMCA-046, ¶ 26, 44 P.3d 538 (ranch operator had no reasonable expectation of liability coverage under policy with saddle animal liability exclusion provision where exclusion was unambiguous, insured did not specifically request saddle animal liability coverage, and agent made no statements to insured that could lead insured to reasonably expect coverage).

### 4.    Public Policy

Plaintiff also urges the Court to find coverage because policies that prohibit stacking are particularly repugnant to public policy when separate premiums are paid for UM/UIM coverage. The Court, however, finds that denial of stacking under the facts and circumstances of this case is not contrary to public policy.  Although New Mexico has expressed a strong public policy in favor of stacking, *see Samora v. State Farm Mut. Auto. Ins. Co.*, 119 N.M. 467, 469-70, 892 P.2d

600, 602-03 (1995), neither New Mexico case law nor public policy require stacking for Class 2 insureds. *See Ponder*, 2000-NMSC-033, ¶ 22, 12 P.3d 960 (explaining different rights for purposes of stacking UM coverage benefits for Class 1 and Class 2 insureds); *Lopez v. Foundation Reserve Ins. Co., Inc.*, 98 N.M. 166, 172, 646 P.2d 1230, 1236 (1982) (holding that Class 2 insured's coverage was limited to coverage purchased on vehicle in which he was riding); *Rehders*, 2006-NMCA-058, ¶ 31, 135 P.3d 237 (New Mexico's strong public policy favoring stacking applies only to Class 1 insureds). *See also Jaramillo*, 117 N.M. at 339 n.1, 871 P.2d at 1345 ("Under judicial stacking, a class-one insured is entitled, as a matter of law, to aggregate all UM coverages purchased with separate premiums. . . . A class-one insured in judicial stacking refers generally to those persons who are 'named insureds' under a UM policy."). Where the policy language is clear and the extrinsic evidence does not reveal an ambiguity, it is not inimical to the state's public policy to apply the terms as written. *See Benns*, 982 F.2d at 464 (noting that in obtaining insurance in name of corporation instead of taking out policy in own name, plaintiff made economic decision to save money, and thus, he could not ask state's public policy to override clear terms of otherwise acceptable policy to protect himself from adverse effects of economic decision); *Ponder*, 2000-NMSC-033, ¶ 11, 12 P.3d 960 (when policy language is clear and unambiguous and does not violate public policy, courts must give effect to contract and enforce it as written). The Court therefore concludes that Plaintiff is not entitled to stacking as a matter of law.

### 5.    UIM Claim

Because Plaintiff is not entitled to stacking, she is limited to the $60,000.00 CSL for any one accident. As previously discussed, according to NMSA § 66-5-301(B), underinsured status

occurs when the aggregate of the insured's UM coverage is greater than the tortfeasor's liability coverage. *See Morro*, 106 N.M. at 672, 748 P.2d at 515. The Policy similarly defines an underinsured motor vehicle. *See* Pl.'s App. at 18 ("An underinsured motor vehicle is a motor vehicle for which the sum of all liability bonds or policies at the time of an 'accident' provides at least the amounts required by the applicable law where a covered 'auto' is principally garaged but their limits are less than the sum of the limits of this coverage applicable to the 'insured'."). It is undisputed that Plaintiff received $85,008.73, in her settlement with Allstate. Since Plaintiff received more from the tortfeasor than her total UM/UIM coverage limits, the tortfeasor was not underinsured within the meaning of the statute or the Policy. Furthermore, it is undisputed that the following provision of the Policy allows for offsetting the amount of liability payments recovered from the tortfeasor: "With respect to damages resulting from an 'accident' involving an underinsured motor vehicle . . . the Limit of Insurance shall be reduced by all sums paid by or for anyone who is legally responsible, including all sums paid under this Coverage Form's Liability Coverage." *Id.* at 17. Plaintiff does not dispute that the offsetting provision precludes recovery if Plaintiff is unable to stack UM/UIM coverage. The Court has determined that Plaintiff is not entitled to stacking. Therefore, Plaintiff is not entitled to UIM coverage under the Policy as a matter of law.

　　　　Defendant requests summary judgment on all Plaintiff's claims based on Plaintiff not being entitled to UIM coverage. Based on Plaintiff's complaint, it appears that all her claims are dependent upon her entitlement to UIM coverage. *See* Compl. ¶ 16 (describing her claims as "under her uninsured/underinsured motorist coverage"). Moreover, Plaintiff does not assert that the Court should not grant summary judgment to Defendant on all her claims if it finds that she is

not entitled to stacking. Accordingly, given the Court's determination that Plaintiff is not entitled to stacking and UIM coverage, the Court finds that Defendant's motion for summary judgment on all Plaintiff's claims shall be granted.

      **C.**      **Plaintiff's Motion for Partial Summary Judgment**

The Court has determined that Plaintiff is not entitled to stacking as a matter of law based on the undisputed facts of the case and viewing the disputed facts in the light most favorable to Plaintiff. Therefore, for the same reasons that the Court is granting Defendant's motion for summary judgment, Plaintiff's motion for partial summary judgment must be denied.

**IT IS THEREFORE ORDERED** that

1.      Plaintiff's Motion to Certify Questions (Doc. No. 37) is **DENIED**;

2.      Plaintiff's Motion for Partial Summary Judgment (Doc. No. 26) is **DENIED**; and

3.      Defendant's Motion and Brief in Support of Summary Judgment (Doc. No. 29) is

**GRANTED**. The Court grants judgment as a matter of law to Defendant on all Plaintiff's claims.

_____
UNITED STATES DISTRICT JUDGE